CLYDE & CO US LLP
200 Campus Drive
Suite 300
Florham Park, N.J. 07932-0950
(973) 210-6700
Attorneys for Plaintiff, Ramada Worldwide Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAMADA WORLDWIDE INC., a Delaware Corporation, | : Civil Action No. 13- |
| Plaintiff, | : |
| v. | : **COMPLAINT** |
| STEVE YOUNG KIM, an individual; and YOUNG SOON KIM, an individual, | : |
| Defendants. | : |

Plaintiff Ramada Worldwide Inc., by its attorneys, Clyde & Co US LLP,

complaining of defendants Steve Young Kim and Young Soon Kim, says:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Ramada Worldwide Inc. ("RWI") is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in

Parsippany, New Jersey.

2.      Defendant Steve Young Kim ("Steve Kim"), on information and belief, is

a citizen of the State of Oklahoma, residing at 1010 N. Garnett Road, Tulsa, Oklahoma 74116.

3.      Defendant Young Soon Kim ("Young Kim"), on information and belief, is a citizen of the State of Oklahoma, residing at 1010 N. Garnett Road, Tulsa, Oklahoma 74116.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and both defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

5.      This Court has personal jurisdiction over Steve Kim and Young Kim by virtue of, among other things, section 17.6.3 of the September 25, 2007 license agreement by and between Steve Kim and Young Kim and RWI (the "License Agreement"), described in more detail below, pursuant to which Steve Kim and Young Kim have consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

6.      Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Steve Kim and Young Kim of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

7.      On or about September 25, 2007, RWI entered into the License Agreement with Steve Kim and Young Kim for the operation of a 158-room Ramada® guest lodging facility located at 1010 N. Garnett Road, Tulsa, Oklahoma 74116, Site No. 23031-72362-1 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

8.      Pursuant to section 5 of the License Agreement, Steve Kim and Young Kim were obligated to operate a Ramada® guest lodging facility for a fifteen-year term.

9.      Pursuant to section 3.4 of the License Agreement, Steve Kim and Young Kim were required to operate the Facility in compliance with RWI's "System Standards," as defined in the License Agreement.

10.     Pursuant to section 3.10 of the License Agreement, Steve Kim and Young Kim were required to "obtain and maintain…the insurance coverage required under the Systems Standards Manual from insurers meeting the standards established in the Manual."

11.     Pursuant to section 7, section 18.2, and Schedule C of the License Agreement, Steve Kim and Young Kim were required to make certain periodic payments to RWI for royalties, service assessments, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

12.     Pursuant to section 7.3 of the License Agreement, Steve Kim and Young Kim agreed that interest is payable "on any past due amount payable to [RWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

13.     Pursuant to section 3.8 of the License Agreement, Steve Kim and Young Kim were required to disclose, among other things, the amount of gross room revenue earned by Steve Kim and Young Kim at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to RWI.

14.     Pursuant to section 3.8 of the License Agreement, Steve Kim and Young Kim agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, Steve Kim and Young Kim agreed to allow RWI to examine, audit, and make copies of the entries in these books, records, and accounts.

15.     Pursuant to section 11.2 of the License Agreement, RWI could terminate the License Agreement, with notice to Steve Kim and Young Kim, for various reasons, including Steve Kim and Young Kim's (a) failure to pay any amount due RWI under the License Agreement, (b) failure to remedy any other default of their obligations or warranties under the License Agreement within 30 days after receipt of written notice from RWI specifying one or more defaults under the License Agreement, and/or (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

16.     Pursuant to section 12.1 of the License Agreement, Steve Kim and Young Kim agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, they would pay liquidated damages to RWI in accordance with a formula specified in the License Agreement.

17.     Section 18.1 of the License Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room of the Facility Steve Kim and Young Kim were authorized to operate at the time of termination.

18.     Pursuant to section 17.4 of the License Agreement, Steve Kim and Young Kim agreed that the non-prevailing party would "pay all costs and expenses, including

reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

## The Defendants' Defaults and Termination

19.     On or around September 2, 2009, RWI instituted litigation against Steve Kim and Young Kim for outstanding Recurring Fees owed to RWI pursuant to the terms of the License Agreement.

20.     Beginning in 2010, Steve Kim and Young Kim repeatedly failed to provide proof that they had obtained the minimum insurance coverage required by RWI under the License Agreement.

21.     By letter dated June 22, 2010, a true copy of which is attached hereto as Exhibit B, RWI advised Steve Kim and Young Kim that (a) they were in breach of the License Agreement because they failed to provide proof that they had obtained the minimum insurance coverage required by RWI under the License Agreement, (b) they had 30 days within which to cure this insurance default, and (c) if the default was not cured, then the License Agreement might be subject to termination.

22.     By letter dated August 4, 2010, a true copy of which is attached hereto as Exhibit C, RWI advised Steve Kim and Young Kim that (a) they were in breach of the License Agreement because they failed to provide proof that they had obtained the minimum insurance coverage required by RWI under the License Agreement, and (b) if the default was not cured, then the License Agreement might be subject to termination.

23.    On or around August 19, 2010, judgment (the "Judgment") was entered against Steve Kim and Young Kim in the amount of $160,091.61, of which $154,948.61 represented Recurring Fees owed to RWI as of August 16, 2010.

24.    By letter dated September 21, 2010, a true copy of which is attached as Exhibit D, RWI terminated the License Agreement effective September 21, 2010 and advised Steve Kim and Young Kim that they were required to pay to RWI as liquidated damages for premature termination the sum of $158,000.00 as required under the License Agreement, and all outstanding Recurring Fees through the date of termination.

## **FIRST COUNT**

25.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 24 of the Complaint.

26.    Pursuant to sections 3.8 and 4.8 of the License Agreement, Steve Kim and Young Kim agreed to allow RWI to examine, audit, and make copies of Steve Kim and Young Kim's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

27.    The calculation of the monetary amounts sought by RWI in this action is based on the gross room revenue information supplied to RWI by Steve Kim and Young Kim and, to the extent there has been non-reporting, RWI's estimate as to the gross room revenue earned by Steve Kim and Young Kim.

28.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Steve Kim and Young Kim.

**WHEREFORE**, RWI demands judgment ordering that Steve Kim and Young Kim account to RWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the License Agreement.

## SECOND COUNT

29.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 28 of the Complaint.

30.     By letter dated September 21, 2010, RWI terminated the License Agreement effective September 21, 2010 due to Steve Kim and Young Kim's continued failure to meet their insurance obligations under the License Agreement.

31.     Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensees, Steve Kim and Young Kim shall pay liquidated damages to RWI within 30 days of termination.

32.     As a result of the termination of the License Agreement, Steve Kim and Young Kim are obligated to pay RWI liquidated damages in the amount of $158,000.00, as calculated pursuant to sections 12.1 and 18.1 of the License Agreement.

33.     Notwithstanding RWI's demand for payment, Steve Kim and Young Kim have failed to pay RWI the liquidated damages as required in sections 12.1 and 18.1 of the License Agreement.

34.     RWI has been damaged by Steve Kim and Young Kim's failure to pay liquidated damages.

**WHEREFORE**, RWI demands judgment against Steve Kim and Young Kim for liquidated damages in the amount of $158,000.00, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

35.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 34 of the Complaint.

36.     By virtue of the premature termination of the License Agreement, RWI sustained a loss of future revenue over the remainder of the fifteen-year term of the License Agreement.

37.     If the Court determines that Steve Kim and Young Kim are not liable to pay RWI liquidated damages as required by sections 12.1 and 18.1 of the License Agreement then, in the alternative, Steve Kim and Young Kim are liable to RWI for actual damages for the premature termination of the License Agreement.

38.     RWI has been damaged by Steve Kim and Young Kim's breach of their obligation to operate a Ramada® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, RWI demands judgment against Steve Kim and Young Kim for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

39.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 38 of the Complaint.

40.     Pursuant to section 7, section 18.2, and Schedule C of the License Agreement, Steve Kim and Young Kim were obligated to remit Recurring Fees to RWI.

41.     Despite their obligation to do so, Steve Kim and Young Kim failed to remit certain of the Recurring Fees due and owing under the License Agreement, since entry of the Judgment, in the amount of $96,782.47.

42.     Steve Kim and Young Kim's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged RWI.

**WHEREFORE**, RWI demands judgment against Steve Kim and Young Kim for the Recurring Fees due and owing under the License Agreement, since entry of the Judgment, in the amount of $96,782.47, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

43.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 42 of the Complaint.

44.     At the time of the termination of the License Agreement, Steve Kim and Young Kim were obligated to pay RWI Recurring Fees.

45.     Despite their obligation to do so, Steve Kim and Young Kim failed to pay certain of the Recurring Fees due and owing under the License Agreement, since entry of the Judgment, in the amount of $96,782.47.

46.     Steve Kim and Young Kim's failure to compensate RWI constitutes unjust enrichment and has damaged RWI.

**WHEREFORE**, RWI demands judgment against Steve Kim and Young Kim for the Recurring Fees due and owing under the License Agreement, since entry of the Judgment, in the amount of $96,782.47, together with interest, attorneys' fees, and costs of suit.

**CLYDE & CO US LLP**
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: _____
            **BRYAN P. COUCH**

Dated:  7/19/13

- 10 -

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**CLYDE & CO US LLP**
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: _____
      **BRYAN P. COUCH**

Dated: 7/19/13

# EXHIBIT A

Location: **TULSA, OK**
Entity No. 12362-01
Unit No.: 23031

# RAMADA WORLDWIDE INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated a-25, 2007, is between **RAMADA WORLDWIDE INC.**, a Delaware corporation ("we", "our" or "us"), and **STEVE YOUNG KIM AND YOUNG SOON KIM**, joint tenants ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Ramada Inn."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Ramada Inns National Association.**

2.1 **Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain licensees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

2.2 **RINA Conference.** You or your representative will attend each RINA Conference when it is held. You will pay not less than one "Conference Registration Fee" for each Facility you own. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Agreement is ninety (90) days after the Effective Date. All renovations will

1

comply with System Standards, any Approved Plans and the Punch List. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. You must also pay us the Reinspection Fee described in Section 3.9 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

**3.4 Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

**3.5 Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

**3.6 Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

**3.6.1** You will participate in any regional management association ("RMA") of Chain licensees formed to provide regional marketing, training, and other benefits for Chain Facilities in your area. You will pay the RMA Fee described in Schedule C to support the RMA's activities, if and when levied.

**3.6.2** The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs, including arrangements we make with third party distribution channels.

RAMEXC1
216571-03/07

3

You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

**3.7  Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

**3.8  Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.8 as described in Section 4.8 and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Section 3.1. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Ramada Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.11  **Conferences.** You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2. Mandatory recurrent training for licensees and general managers described in Section 4.1.4 may be held at a RINA conference.

The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks only from suppliers we approve. You must lease your exterior signage face plates from our approved leasing company. You may purchase or lease other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 125 points and the most recent quality assurance inspection score for the Facility was no more than 150 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

**4.1  Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

**4.1.1  General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.  We may also offer certain Internet-based training as a supplement to the classroom training experience.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date.  Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training.  We charge you tuition for general manager orientation which is payable before the scheduled date of the program. The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section.  For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.  We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class.  If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period.  We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

**4.1.2  Owner Orientation Training.**  We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.   If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date.  If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place.  Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program.  You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

4.1.3 **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. This training may be offered at our corporate offices, at a regional location, on-line, or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. Tuition for remedial training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No-Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any other member of your staff cancel participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program as we establish from time to time. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA Services Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

4.3 **Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from RINA Services Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards. We may offer optional architectural and design services for the Facility for a separate fee.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies

and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7  **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8  **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

5.  **Term.**  The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.  **Application and Initial Fees.**  We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of **$17,500.00**, when you sign this Agreement, which is fully earned when we sign this Agreement.

7.  **Recurring Fees, Taxes and Interest.**

7.1  You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty and RINA Services Assessment Fees described in this Section 7.1 are payable fifteen days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the time set forth in the System Standards. Recurring Fees include the following:

7.1.1  A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2  A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods. On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new

services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

**8. Indemnifications.**

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not

11

assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is

involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4 Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5 Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6 Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

RAMEXC1
216571 03/07

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

## 11. Default and Termination.

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

### 11.3 Casualty and Condemnation.

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2 You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4 **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5 **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

RAMEXCI
216571 03/07

## 12. Liquidated Damages.

12.1 Generally. If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.1, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two License Years, Liquidated Damages will be as set forth in Section 18.1. If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 Condemnation Payments. In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

## 13. Your Duties At and After Termination. When the License or this Agreement terminates for any reason whatsoever:

13.1 System Usage Ceases. You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 Other Duties. You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the

.16.

Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3  **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4  **Survival of Certain Provisions.**  Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.  Your Representations and Warranties.**  You expressly represent and warrant to us as follows:

14.1  **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2  **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization,

insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3  **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.  Proprietary Rights.

15.1  **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2  **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3  **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory defined in Section 17.8. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

RAMEXC1
216571 03/07

**15.4   Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information.   Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).   You will use Confidential Information only for the Facility and to perform under this Agreement.   Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S.   Copyright Act, as amended.   Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.   We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

**15.5   Litigation.**   You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.   We alone handle disputes with third parties concerning use of all or any part of the System.   You will cooperate with our efforts to resolve these disputes.   We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

**15.6   The Internet.**   You may use the Internet to market the Facility subject to this Agreement and System Standards.   You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.   You will assign to us any such identification at our request without compensation or consideration.   You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties.   You must participate in the Chain's best available rate on the Internet guarantee or successor program.   The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.   You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.   Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16. **Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

17. **Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices will be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Worldwide Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278

RAMEXCl
216571 03/07

Attention: Vice President-Franchise Administration;
Fax No. 1-800-643-2107

Your name: **Steve Young Kim and Young Soon Kim**
Your address: **13 Freeman Lane, Buena Park, CA 90621**
Attention: **Steve Kim**
Your fax No.: **909-620-2522**

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

17.6 **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4 **WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.7 **Special Acknowledgments.** You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.

**17.7.1** You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

**17.7.2** Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

**17.7.3** This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4** You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5** You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

**17.8 Protected Territory.** We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or

occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **all the area within a circle created by a three (3) mile radius whose centerpoint is the front door of the Facility.**

**18. Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 **Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

18.2. **Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the RINA Services Assessment Fee (excluding commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18.2.1 The Combined Fee shall be six and one half percent (6.5%) of Gross Room Revenues accruing during the first four License Years; and

18.2.2 The Combined Fee shall be seven and one half percent (7.5%) of Gross Room Revenues accruing during the fifth and sixth License Years; and

18.2.2 The Royalty and RINA Services Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the sixth License Year.

18.2.3 The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 125 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 125 in a reinspection to be performed not less than 60 days after the initial inspection.

However, provided that you execute and deliver to us a License Agreement for a Ramada lodging facility to be located at 7909 E. IH-40, Amarillo, Texas no later than November 1, 2007 and open said Facility no later than June 1, 2008, the Recurring Fees shall be:

18.2.4  For each of the first two License Years, the Combined Fee shall be (i) 5.5% for the first $1.8 million of Gross Room Revenues generated by the Facility in each such License Year, (ii) 8.5% for the amount of Gross Room Revenues generated by the Facility in each such License Year in excess of this $1.8 million.

18.2.5  For each of the third and fourth License Years, the Combined Fee shall be (i) 6% for the first $1.8 million of Gross Room Revenues generated by the Facility in each such License Year, (ii) 8.5% for the amount of Gross Room Revenues generated by the Facility in each such License Year in excess of this $1.8 million.

18.2.6  For each of the fifth and sixth License Years, the Combined Fee shall be (i) 6.5% for the first $1.8 million of Gross Room Revenues generated by the Facility in each such License Year, (ii) 8.5% for the amount of Gross Room Revenues generated by the Facility in each such License Year in excess of this $1.8 million.

18.2.7  For the seventh License Year, the Combined Fee shall be (i) 7% for the first $1.8 million of Gross Room Revenues generated by the Facility in such License Year, (ii) 8.5% for the amount of Gross Room Revenues generated by the Facility in such License Year in excess of this $1.8 million.

18.2.8  The Royalty and RINA Services Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the seventh License Year.

18.2.9   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 125 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 125 in a reinspection to be performed not less than 60 days after the initial inspection.

18.3   **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the tenth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination.   You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 125 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 125 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

the Assignment and Assumption Agreement in the form attached as an exhibit to this Agreement before you transfer the Facility. No Application or Relicense Fees will be charged. The accounts of the transferee and you must be current at the time of transfer, or we will not recognize the transfer. The transferee must submit (i) an application on our standard form, (ii) its organizational agreement or charter, (iii) updated insurance, and (iv) an updated Guaranty with the Assignment and Assumption Agreement. We will not recognize the transfer as effective until these documents are completed and delivered to us. The transferee must send us a copy of the warranty deed conveying the Facility within 30 days after its delivery.

**remainder of page intentionally left blank**

IN WITNESS WHEREOF, the parties have executed this Agreement on this ___ day of
_____, 200__ and agree to be bound by the terms and conditions of this Agreement as of
the Effective Date.

WE:
RAMADA WORLDWIDE INC.:

By: _____
            Vice President

YOU, as licensee:

By: _____
        Steve Young Kim
        Individually

By: _____
        Young Soon Kim
        Individually

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RINA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) If the Opening Date occurs on the first day of a month: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) If the Opening Date does not occur on the first day of a month: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **1010 N. Garnett Road, Tulsa, OK 74116**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii)

trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Minor Renovation</u> means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

<u>Minor Renovation Ceiling Amount</u> means $3,000.00 per guest room.

<u>Minor Renovation Notice</u> means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Punch List</u> means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

<u>Reinspection Fee</u> means the fee you must pay to us under Section 3.9 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

<u>Relicense Fee</u> means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation Service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Ramada Worldwide Inc., a Delaware corporation, its successors and assigns.

**SCHEDULE A**

**(Legal Description of Facility)**

SEP. 21. 2007 2:33PM GUARANTY ABSTRACT    NO. 2274 P. 2/3
Doc # 2007101075 Page
Receipt # 844474  09/07/07  14:58:11
Fee 15.00 Stamps  8100.00

*000944474025*



**Guaranty Abstract Company**

Mail taxes to:
*1010 H. Lewittt*
*Tulsa, OK.*

Doc Stamps
*$3,100.00*

## WARRANTY DEED
### (CORPORATE FORM – WITH SURVIVORSHIP)

THIS INDENTURE, made this 6th day of September, 2007, by and between Bailey's, Incorporated (referred to herein as "Grantor" whether one or more), and STEVE YONG KIM AND YOUNG SOON KIM, husband and wife (referred to herein as "Grantees").

WITNESSETH, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Grantor does hereby grant, bargain, sell and convey unto said Grantees, not as tenants in common, but as joint tenants with the right of survivorship, and to the survivor of them, and to the heirs and assigns of such survivor, forever, all of the following described real estate situated in the County of, State of Oklahoma, to-wit:

A portion of Lot One (1), Block One (1), WINEGARDNER-HAMMONS OPERATIONS COMMERCIAL CENTER ADDITION, an Addition in the City of Tulsa, County of Tulsa, State of Oklahoma, according to the recorded Plat thereof, more particularly described as follows, to-wit:

Commencing at the Northeast corner of Winegardner-Hammons Operations Commercial Center Addition; thence S 88°47'06" W and along the North line of said addition a distance of 132.74 feet to the Point of Beginning; thence S 01°06'33" E a distance of 169.50 feet to a point; thence N 88°47'06" E a distance of 132.74 feet to a point; thence S 01°06'33" E a distance of 160.54 feet to a point; thence S 88°53'27" W a distance of 175 feet to a point; thence S 01°06'33" E a distance of 155.90 feet to a point on the South line of Winegardner-Hammons Operations Commercial Center Addition; thence S 87°23'21" W and along the South line of said Addition being also the North right-of-way line of I-244 Expressway a distance of 466.73 feet to a point; thence N 03°07'23" W a distance of 39.0 feet to a point; thence S 86°52'47" W a distance of 16.0 feet to a point; thence N 03°07'23" W a distance of 28 feet to a point; thence N 86°52'47" E a distance of 16.0 feet to a point; thence N 03°07'13" W a distance of 430.17 feet to a point on the North line of said Addition; thence N 88°47'06" E and along the North line of said Winegardner-Hammons Operations Commercial Center Addition a distance of 526.22 feet to the Point of Beginning.

together with all of the improvements thereon and the appurtenances thereunto belonging, and warrants the title to the same.

TO HAVE AND TO HOLD said described premises unto Grantees jointly with right of survivorship, and to the survivor of them, and to the heirs and assigns of such survivor forever, free, clear and discharged of and from all former grants, charges, taxes, judgments, mortgages and other liens and encumbrances of whatsoever nature, except easements and building restrictions of record and special assessments not yet due.

SIGNED AND DELIVERED the date first above written.

## SCHEDULE B

**PART I:    YOUR OWNERS:**

| Name | Ownership Percentage | Type of Equity Interest | (Title) Office Held |
|------|----------------------|-------------------------|---------------------|
| Steve Young Kim | 50% | Individual | |
| Young Soon Kim | 50% | Individual | |

**PART II:         THE FACILITY:**

Primary designation of Facility: **Ramada Inn**

Number of approved guest rooms: **158**

Parking facilities (number of spaces, description): **at least 158**

Other amenities, services and facilities:

**PART III:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION:**

**[Punch List to be attached.]**

Initial

RAMEXCI
216571 03/07

34

OK Tulsa Holiday Inn Airport CV RA

Tier: Inn

**Ramada Worldwide, Inc.**
**Punchlist for Conversion**
**"Schedule B Part III"**
**August 16, 2007**
**Revised on September 4, 2007**

# RAMADA
### W O R L D W I D E

Page 1 of 7

## OWNER/APPLICANT

| | |
|---|---|
| Property Name: | Holiday Inn Airport |
| Property Address: | 1010 N. Garnett Road |
| City: | Tulsa   St: OK   Zip: 74116 |
| Conversion Consultant: | John M. Fair |
| Owner/Applicant: | Steve Kim |
| Phone: | (909) 445-6581 |
| Salesperson: | Anthony Goldstein |
| Phone: | (949) 367-2455 |

## ROOM DIMENSIONS - EXISTING

| | | | | |
|---|---|---|---|---|
| # of Rms 158 | 12 | (width) x 25 | (length) = 300.00 | sq. ft. |
| # of Rms | | (width) x | (length) = | sq. ft. |
| # of Rms | | (width) x | (length) = | sq. ft. |
| # of Rms | | (width) x | (length) = | sq. ft. |
| # of Rms | | (width) x | (length) = | sq. ft. |
| # of Rms | | (width) x | (length) = | sq. ft. |

## GUESTROOMS

| TOTAL ROOMS: | 158 |
|---|---|
| Rentable | 158 |
| Kings | 75 |
| Doubles | 79 |
| Singles | 4 |

## PROPERTY CONDITION SUMMARY

This 25+ year-old facility consists of one L-shaped, 2-story, interior-corridor guestroom building with synthetic stucco facade and concrete block construction. The guestroom building is connected to a rectangular-shaped 1-story commercial building via common areas. Both buildings feature synthetic stucco facade, and concrete block construction. The guestroom building has a pitched metal roof. The commercial building has a standing seam metal mansard roof. The property will require exterior, public area and guestroom/bath renovations to comply with System Standards. Landscaping will require upgrading to enhance curb appeal.

Currently the restaurant is closed for lunch on Saturdays and Sundays.

The property is located along I-244 (Exit 14) approximately 5 miles South of the Tulsa International Airport. The market is predominately corporate business with some transient/leisure, and event traffic. Area competition includes a Country Inn & Suites, America's Best Value Inn and a Best Western.

ROOM DIMENSION STANDARD: 288 SF

## PUBLIC AREA DIMENSIONS - EXISTING

| | | | | | STANDARD |
|---|---|---|---|---|---|
| Lobby | 20 | (width) x 46 | (length) = 920.00 | sq. ft. | 800 SF |
| Restaurant | 58 | (width) x 38 | (length) = 2204.0 | sq. ft. | N/A |
| Lounge | 32 | (width) x 72 | (length) = 2304.0 | sq. ft. | N/A |

## PUBLIC AREA DIMENSIONS - EXISTING

| | | | | | STANDARD |
|---|---|---|---|---|---|
| Meeting Room | 79 | (width) x 39 | (length) = 3081.0 | sq. ft. | N/A |
| Boardroom | 12 | (width) x 14 | (length) = 168.00 | sq. ft. | N/A |
| | | (width) x | (length) = | sq. ft. | |

## BRAND VARIANCES

* The existing painted brick accent walls and columns in the video/game area and pool area are acceptable if condition is maintained.
* The existing wood wainscoting in the restaurant is acceptable if condition is maintained.
* The existing wood walls in the lounge are acceptable if condition is maintained.
* The hardwood floors in the restaurant and lounge are acceptable if condition is maintained.
* Existing 2-bulb nightstand lamp is acceptable in lieu of the required double-armed swing lamp.
* Existing 25" television units are acceptable until condition grades a "Moderate" or units become inoperable, whichever occurs first. Upon replacement, new units per System Standards are required.

**ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST. PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.**

This Punchlist identifies actions needed to cause the Facility to meet the Franchisor's standards. You are solely responsible for compliance of the Facility with applicable federal, state and local laws, codes, ordinances and regulations.
You have been provided a Punchlist Reference Guide to assist in compliance with punchlist completion and Brand Standards.
This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet our Standards, or comply with law, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date.

Revisions-All Previous Copies are Invalid
9-4-07                tg

**The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application.**
**You should not consider this Punchlist to be final until we sign the License or Franchise Agreement.**

Signed: _____    Date: _____

Print Name: _____

Quality Assurance

Initials:

OK Tulsa Holiday Inn Airport CV RA

## EXTERIOR

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Provide Company approved signage. Signage must be leased and manufactured only by vendors approved in advance by the Franchisor, and may not be installed without prior written approval. Your License Agreement controls your use of signage and timing of installation. All existing signage (building, pylon, channel letters, billboards, etc.) must be removed. | |
| Prior to opening | Paint pylon sign stanchion per System Standards. Contact the Brand Identity Department at (973) 753-7251 for assistance. | |
| 120 days after opening | Paint multi-colored brick pylon and directional sign bases to match/coordinate with building exteriors. | |
| 120 days after opening | Replace "Oklahoma Territory Eatery" restaurant sign at Northeast parking entrance. Contact the Brand Identity Department for assistance. The removal of the sign is an acceptable alternative. | |
| 120 days after opening | Remove "Holiday Inn" design medallions from the secondary entrances and refinish affected areas to a like-new condition. | |
| 120 days after opening | Clean, repair and recoat synthetic stucco (facade, columns, trim, porte cochere, etc.) per manufacturer's specifications. Contact Design Services at (800) 225-5411 for recommended color schemes. | |
| 120 days after opening | Paint/refinish painted brick walkway at lobby entrance. | |
| 120 days after opening | Eliminate grass from walkways. | |
| 120 days after opening | Reseal and stripe East side parking lot. Stripe North, South and West parking lots. | |
| 120 days after opening | Eliminate grass from all parking areas. | |
| 120 days after opening | Resurface truck parking lot (Southeast corner of property). Removal of asphalt and re-graveling the truck lot is an acceptable alternative. | |
| 120 days after opening | Pressure wash parking pad at porte cochere to eliminate stains. | |
| 120 days after opening | Paint/refinish North side Dumpster enclosure. | |
| 120 days after opening | Remove trailer storage unit from properties Southwest corner. Trailer style storage units are not acceptable. | |
| 120 days after opening | Upgrade landscaping by providing additional shrubs, flowers and groundcover in existing landscaped areas. Manicure existing landscaping to eliminate overgrowth and weeds and maintain a regular grooming schedule. Maintain a regular watering schedule to eliminate dead grass areas. | |
| | | |

OK Tulsa Holiday Inn Airport CV RA

## PUBLIC AREAS

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Provide a property management system per System Standards. | |
| 90 days after opening | All owners/general managers are required to attend all Brand orientation/training. | |
| 90 days after opening | Property manager is required to be TripRewards certified and property must comply with all TripRewards requirements. | |
| 120 days after opening | Provide a voicemail system, safe deposit boxes, complimentary USA Today® newspapers, logo'd keycards with the 800 reservations number and web address and valet laundry service. | |
| 120 days after opening | Provide Complimentary wireless, high-speed Internet access in all public spaces from an approved Vendor (i.e. Deep Blue and Ethostream). | |
| 120 days after opening | Provide flammable storage per System Standards. | |
| 120 days after opening | Removal of all previous property affiliation signage is required. Replace "Holiday Inn" logo'd public area signage package, to include guestroom door plaques with a professionally produced and displayed "Ramada" logo'd or generic style signage package. | |
| 120 days after opening | Prep women's public restroom walls and install vinyl wallcovering per System Standards. Company requires minimum 20 ounce vinyl wallcovering. | |
| 120 days after opening | Replace chairs in women's restroom. Guestroom style furniture is not acceptable for use in public areas. Removal of chairs is an acceptable alternative. | |
| 120 days after opening | Remove toilet seat/lid units in women's restroom. An open face toilet seat only is required in public facilities; lids are not acceptable. | |
| 30 days after opening | Professionally clean corridor carpet to include stairwells. If carpet grades a "Moderate " on the opening evaluation, immediate replacement is required. | |
| 120 days after opening | Replace corridor vinyl wallcovering where discolored as at room #239. | |
| 120 days after opening | Replace guestroom entrance doors where improperly repaired (i.e. in pool area). | |
| | Paint/refinish guestroom entrance doors/trim where scuffed. | |

Produced using AZ software, 800.234.4727 www.datasys.com

Quality Assurance

Initials

PUBPA

OK Tulsa Holiday Inn Airport CV RA

| COMPLETION DATE | PUBLIC AREAS SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 120 days after opening | Currently the exercise room facility does not meet System Standards. Exercise room facility is required to provide the following: Minimum one treadmill and one multi-station weight machine with two additional exercise machines (additional two units should be 'state of the art' aerobic equipment approved by Ramada.), minimum 27" flat screen HDTV wall/ceiling mounted TV, weight scale, three coat/towel hooks, telephone with direct dial to front desk, full view wall mirror, fresh towels, soiled linen disposal and a water cooler. | |
| 30 days after opening | Replace computer generated signage in the exercise room facility with a professionally produced/displayed signage package. Computer generated signage is not acceptable. | |
| Prior to opening | All exercise equipment must be maintained and inspected as per the manufacturer guidelines and emergency instructions, assumed liability signage and guest use only signage must be prominently displayed in the exercise room. | |
| Prior to opening | Currently the business center does not meet System Standards. Ensure the business center provides copying capability, computer with word processing program, printer fax machine, minimum 2 phones with data ports, free access to 800 numbers, office supplies (i.e. pens, pads, stapler, etc.). Minimum required hours of operation are between 8AM to 8PM. | |
| 120 days after opening | Replace carpet in the business center per System Standards. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. | |
| 120 days after opening | Replace laminate counter in business center. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. | |
| 120 days after opening | Replace metal desk in business center. New desk must match/coordinate with existing counter finishes. Removal of desk is an acceptable alternative. | |
| Prior to opening | Maintain swimming pool clear water appearance with routine maintenance and the proper use of chemicals. | |
| 120 days after opening | Pressure wash swimming pool deck. | |
| 120 days after opening | Replace pool area furniture package. A minimum of 4 umbrella tables, 16 chairs and 10 chaise lounges are required, company requires one consistent style of furniture throughout the pool area. | |
| 120 days after opening | Repair/replace chair lift in pool area. | |
| 30 days after opening | Replace computer generated signage in the pool area with a professionally produced/displayed signage package. Computer generated signage is not acceptable. | |

Protected using ACT software, 800.234.4727 www.afract.com

Quality Assurance

Initials: [signature]

OK Tulsa Holiday Inn Airport CV RA

Page: 5 of 7

| COMPLETION DATE | FOOD AND BEVERAGE SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Currently the restaurant is open 6:00 AM to 1:00 PM and 5:00 PM to 10:00 PM Monday through Friday, 7:00 AM to 10:00 AM and 6:00 PM to 10:00 PM Saturday and Sunday. The Lounge is open 5:00 PM to 11:00 PM Monday through Friday and 6:00 PM to 11:00 PM Saturday and Sunday. This is not acceptable. | |
| Prior to opening | Ramada Inns are designed to be full service properties. They are required to have a full menu service restaurant with 3 meal periods, a lounge and meeting room facilities or a Hospitality Area with Mart and meeting room facilities. Room service is recommended. | |
| Prior to opening | Open restaurant for lunch service on Saturdays and Sundays. If restaurant remains closed a Ramada Mart and Hospitality area is required. | |
| Prior to opening | If the restaurant remains closed for the lunch period on Saturdays and Sundays the construction of a Ramada Mart and Hospitality Area per current System Standards is required. Plans are required to be submitted to Design Services for approval prior to commencement of work. | |
| 120 days after opening | Replace restaurant seating package (chairs and tables). Company requires one consistent style/color of chair and table throughout the restaurant. Self-adhesive vinyl covered tables are not acceptable. | |
| | If anytime in the future, the restaurant closes or ceases to serve all three meal periods the following items are required. The construction of a Ramada Convenience Mart and Hospitality Area per current System Standards. Plans are required to be submitted to Design Services for approval prior to commencement of work. | |
| | Provide complimentary continental breakfast menu items per current System Standards. | |
| | Stock Ramada Convenience Mart with required Sundry items per current System Standards. | |
| | Construct a pantry area per Ramada System Standards. Plans are required to be submitted to Design Services for approval prior to commencement of work. | |
| 120 days after opening | Replace meeting room and pre-function area carpet. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. | |
| 120 days after opening | Prep meeting room walls and install wallcovering per System Standards. Company requires minimum 20 ounce vinyl wallcovering. | |
| 120 days after opening | Professionally clean fabric sound-proof dividers in meeting room to eliminate stains and discoloration. If stains and discoloration cannot be removed dividers must be reupholstered. | |
| Prior to opening | Currently the Board Room is closed and used for storage. Complete renovation of all FF&E to meet System Standards is required before Board Room is reopened. | |

Quality Assurance

Initials: _____

Produced using ACE software, 800.223.4722 www.acfwms.com

OK Tulsa Holiday Inn Airport CV RA

**GUESTROOMS**

ROOMS INSPECTED: 204, 215, 220, 239, 243, 264, 288, 175, 106, 130, 126, 122, 123, 102

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances, are required. | |
| 120 days after opening | Ensure nightlights, full-length mirrors, removable wooden hook style hangers, UL trashcans, AM/FM alarm clock radios, coffee makers, data port telephones, irons/full size boards, hairdryers & all required supplies are provided. 80% of rooms must be designated as non-smoking. 3 major networks (ABC, NBC, CBS, FOX, PBS) are required. | |
| 120 days after opening | Provide Complimentary wireless, high-speed Internet access in all guestrooms from an approved Vendor (i.e. Deep Blue and Ethostream). | |
| 120 days after opening | Refinish entrance and connecting doors to include trimwork. | |
| 120 days after opening | Replace secondary chain locks with U-bar locks. | |
| 120 days after opening | Replace hollow core connecting doors as in room #160 with solid core doors. Refinish connecting doors where improperly repaired or discolored as in rooms #102 and #123. | |
| 30 days after opening | Provide connecting door deadbolt locks where missing as in room #160. Company requires a one-way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors. Operating knobs must be located on room side only with flush plates on inside of doors. | |
| 120 days after opening | Retexture and paint walls where damaged as in room #130. Paint textured walls where scuffed as in rooms #122 and #264. Paint entire wall to provide a consistent appearance. | |
| 120 days after opening | Professionally clean carpet. If carpet grades a "Moderate" on the opening evaluation, carpet replacement is required. | |
| 120 days after opening | Replace arm chairs and ottomans in double bedded rooms. New arm chairs/ottomans must match or coordinate with existing casegood package or complete casegood replacement is required. Casegoods must be new upon installation. A minimum of one credenza, a framed wall mirror, one headboard per bed, and one free standing night stand for a two bedded room, two for a single bedded room is required. A writing surface is required to consist of either a desk or an activity table. Two comfortable fabric upholstered chairs per room are required. | |
| 120 days after opening | Paint/refinish PTAC covers to restore condition where scuffed or discolored. | |
| 120 days after opening | Replace complete inventory of linen to include sheets (flat and fitted), pillows and pillowcases and complete inventory of terry stock to include washcloths, bath mats and bath and hand towels per new System Standards. | |
| 120 days after opening | Replace bed toppings with one of the Ramada approved bedding program options (Fitted coverlet, Faux Duvet or Triple Sheet). Contact Design and Procurement Services for product specifications. | |

Quality Assurance

Initials: _____

Produced using AQ Indent, 870.234.0727 www.aqedmt.com

OK Tulsa Holiday Inn Airport CV RA

**GUESTROOMS**

Page 7 of 7

ROOMS INSPECTED: 204, 215, 220, 239, 243, 284, 288, 175, 106, 130, 126, 122, 123, 102

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 30 days after opening | Replace existing bedsets (mattresses and boxsprings) with Serta Concierge Emerald or Sealy Posturepedic Plush bedsets per new System Standards. Invoice must be available at opening with Installation no later than 30 days after opening. | |
| 120 days after opening | Replace bathtubs where worn, discolored or damaged as in rooms #130 and #220. The installation of commercial grade liners or professionally restoring surfaces to like-new condition are acceptable alternatives. | |
| 120 days after opening | Remove tub/surround caulking where mildewed or discolored as in rooms #160 and #215 and recaulk. | |
| 120 days after opening | Replace non-skid treatments in all tubs. | |
| 120 days after opening | Install Moen Revolution showerheads, the Arcs and Angles curved shower rods and Ramada specialty Hookless® shower curtains in all bath areas. | |
| 120 days after opening | Provide "Relax Retreat" amenities per System Standards. | |
| Prior to opening | Removal of all previous affiliation guestroom supplies is required. | |

Quality Assurance

Initials:

**RAMADA WORLDWIDE INC.**
**SCHEDULE C**

**January 2007**

A.    RINA Services Assessment Fee

      The RINA Services Assessment Fee is equal to 4.5% of Gross Room Revenues. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

B.    RMA Fee

      To provide additional regional marketing services through your RMA, we have established a mandatory "RMA Fee". The RMA Fee is $15.00 per guest room per year, up to a maximum of $3,000.00 per year. The RMA Fee will be payable before the start of each year on a date that we establish and communicate to you at least 60 days in advance, and will be fully earned once the year begins. The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval. Each RMA may elect to charge supplemental RMA Fees with our approval.

C.    GDS and Internet Booking Fees

      We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. The GDS Fee described in Section 7 is $5.15 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $4.15 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia.com or hotels.com. We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia.com or hotels.com, our Chain website. GDS and Internet-originated reservations also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.    Additional RINA Services Assessment Fees or Reservation System Charges

      Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf or for Chain Facilities to participate in their programs.

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

E.    Special Marketing Assessment

We charge a Special Marketing Assessment for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise,

entertainment and other awards. The Special Marketing Assessment is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

F.    Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the RINA Executive Committee, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to and resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the RINA Executive Committee. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

# EXHIBIT B



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973.753.6000 Phone
800.880.9445 Fax

June 22, 2010

<u>**VIA OVERNIGHT COURIER**</u>

Mr. Min Kim
1010 North Garnett Road
Tulsa, OK  74116

RE:     **NOTICE OF INSURANCE DEFAULT** - License Agreement dated September 25, 2007 (the
"Agreement") between STEVE YOUNG KIM AND YOUNG SOON KIM) (collectively, "you"
or "your") and RAMADA WORLDWIDE INC. ("we", "our" or "us") for the operation of
Ramada® Unit #23031-72362-1 located in Tulsa, OK (the "Facility")

Dear Mr. Kim:

I have been advised that we have not received confirmation that you have obtained, and delivered to us,
proof of the minimum insurance coverage required by us.  This is a material default under the Agreement.

As you are aware, the Facility's access to our central reservation system has been suspended for
outstanding monetary and quality assurance issues.  If we do not receive proof of proper insurance
coverage within the 30 day cure period, we will add Insurance to the reasons for suspension of access to
our central reservation system.  Furthermore, we may pursue our remedies for default, which may include
termination of the License to operate the Facility under the Ramada® System as provided in the
Agreement at anytime thereafter.

Enclosed, please find our current Insurance Requirements and a Sample Certificate of Liability Insurance.
We urge you to remedy this default immediately.  If you have any questions regarding the minimum
insurance coverage, please call Suzanne Fenimore at (973) 753-7546.

Sincerely,

Carole A. Lennon
Director
Contracts Administration

Enclosure

cc:     Mark Young
        Suzanne Fenimore
        Valerie Capers Workman














**RAMADA WORLDWIDE, INC.**
22 Sylvan Way - Parsippany, NJ 07054
Phone 973-753-7356 Fax 973-753-8343
E-mail: Insurance.Administration@WyndhamWorldwide.com

CHECKLIST

<u>INSURANCE REQUIREMENTS</u>

1. Ramada requires a <u>**Certificate of Insurance**</u>, on proper ACORD form, providing comprehensive (Broad Form CGL) commercial general liability coverage in a minimum amount of **$1,000,000** with excess liability coverage in the amount of **$3,000,000** (per occurrence/per location)--total: **$4,000,000**.  Limits must be per location, and defense costs must be supplementary payments.  Endorsements limiting coverage for bodily injury are not accepted.

2. Coverage must be with licensed insurance companies rated no less than "A-" by A.M. Best.  Cut through endorsements <u>are not</u> accepted.  Claims made policies are not accepted.

3. All policies must contain a provision for notice of cancellation or non renewal to certificate holder of not less than **30 days**.

4. **Ramada Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and all related entities**, must be named as additional insureds (an indication must be noted on the Certificate or the Additional Insured "Grantor of Franchise" endorsement form attached).

5. Comprehensive **Automobile Liability** insurance with minimum limits of $1,000,000 combined single limit per occurrence on all owned, hired and non-owned vehicles (if appropriate), and to be included in the excess liability coverage.

6. **Business Interruption** insurance with a minimum of $100,000 of coverage, actual loss, or 12 months sustained.

7. **Worker's Compensation and Employer's Liability** insurance in compliance with state laws.

8. **Liquor Liability** with minimum limits of $1,000,000 per occurrence (if the exposure exists--whether restaurant/lounge is operated by Licensee or leased to another party), and to be included in the excess liability coverage.

9. All individuals, entities, and their successors or assigns (as appropriate) which are named as Licensees in the License Agreement should be <u>named insureds</u>.

<u>*LOCATION OF PROPERTY MUST BE IDENTIFIED CLEARLY*</u>
**(Street Address, City, and State)**

**Failure to demand compliance with insurance provisions is not a waiver of Licensee's obligations.**

Sample Certificate attached

Rev. 9/9/2009

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YY) |
| --- | --- |
| | «Todays_Date» |

**PRODUCER**

ABC Insurance Agency
Street Address
City, State  ZIP

(Phone Number) (Fax Number)
(Agent E-mail)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**COMPANIES AFFORDING COVERAGE**

| | |
| --- | --- |
| Company **A** | Insert Exact Carrier Name (Include A.M. Best Number) |
| Company **B** | |
| Company **C** | |
| Company **D** | |

**INSURED**

(Insert Name and Address of Insured Here)

**COVERAGES**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIODS INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- |
| A | **GENERAL LIABILITY-LOCAL COUNTRY** <br> X Commercial General Liability <br> ☐ Claims Made  X Occur <br> ☐ Owner's & Contractor's Prot <br> X Liquor Liability | XXXX | 8/18/09 | 8/18/10 | General Aggregate <br> Products-Comp/OP Agg <br> Personal & Adv Injury <br> Each Occurrence <br> Fire Damage (Any one fire) <br> Med Exp (Any one person) | $ 1,000,000 <br> $ 1,000,000 <br> $ 1,000,000 <br> $ 1,000,000 <br> $    50,000 <br> $     5,000 |
| B | **AUTOMOBILE LIABILITY** <br> ☐ Any Auto <br> X All Owned Autos <br> X Scheduled Autos <br> X Hired Autos <br> X Non-Owned Autos <br> ☐ Garage Liability | XXXX | 8/18/09 | 8/18/10 | Combined Single Limit <br> Bodily Injury (per person) <br> Bodily Injury (per accident) <br> Property Damage | $ 1,000,000 |
| B | **EXCESS LIABILITY** <br> X Umbrella Form <br> ☐ Other than Umbrella Form | XXXX | 8/18/09 | 8/18/10 | Each Occurrence <br> Aggregate | $ 3,000,000 <br> $ 3,000,000 |
| A | **OTHER** <br> Property | XXXX | 8/18/09 | 8/18/10 | Building <br> Contents <br> Business Interruption | $ 1,000,000 <br> $   280,000 <br> $   100,000 |

**DESCRIPTION OF OPERATIONS/LOCATIONS/SPECIAL ITEMS**

CERTIFICATE HOLDERS ARE ADDITIONAL INSURED AS RESPECTS HOTEL/MOTEL LOCATED AT:
(INSERT ADDRESS OF INSURED PROPERTY AND SITE NUMBER IF AVAILABLE)

**CERTIFICATE HOLDER [X] ADDITIONAL INSURED; INSURER LETTER: A    CANCELLATION**

RAMADA WORLDWIDE, INC.
WYNDHAM WORLDWIDE CORPORATION
WYNDHAM HOTEL GROUP, LLC.
22 SYLVAN WAY
PARSIPPANY, NJ 07054

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS, OR REPRESENTATIVES.

**AUTHORIZED REPRESENTATIVE**

SIGNATURE

UPS CampusShip: Label/Receipt



## Shipment Receipt

(Keep this for your records.)

Transaction Date 22 Jun 2010

**Address Information**

| Ship To: | Shipper: | Ship From: |
|---|---|---|
| Steve Kim & Young Kim | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Min Kim | Jerilyn Marino | Jerilyn Marino |
| (918) 437-7660 | (973) 753-7253 | (973) 753-7253 |
| Ramada | 22 Sylvan Way | 22 Sylvan Way |
| 1010 N Garnett Road | Parsippany NJ 07054 | Parsippany NJ 07054 |
| TULSA OK 74116-2001 | | |

**Shipment Information**

| Service: | UPS 2nd Day Air |
|---|---|
| *Guaranteed By: | End of Day, Thurs. 24 Jun. 2010 |

| Fuel Surcharge: | . . . . . . . . . . . . . . . . . | **1.45 |
|---|---|---|
| Shipping: | . . . . . . . . . . . . . . . . . | **14.50 |

**Package Information**

Package 1 of 1
Tracking Number:     1Z22445X0292919706
Package Type:          UPS Letter
Actual Weight:          Letter
Billable Weight:         Letter
Reference # 1:          006-5072

**Billing Information**

| Bill Shipping Charges to: | Shipper's Account 22445X |
|---|---|

| Total: | All Shipping Charges in USD | **15.95 |
|---|---|---|

**Note:** Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

** Detailed information on fuel surcharges is also available.

# EXHIBIT C



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973.753.6900 Phone
800.880.9445 Fax

August 4, 2010

**VIA 2ND DAY DELIVERY METHOD**

Mr. Min Kim
1010 North Garnett Road
Tulsa, OK 74116

RE:   **NOTICE OF CONTINUING INSURANCE DEFAULT** - License Agreement dated September 25, 2007 (the "Agreement") between STEVE YOUNG KIM AND YOUNG SOON KIM) (collectively, "you" or "your") and RAMADA WORLDWIDE INC. ("we", "our" or "us") for the operation of Ramada® Unit #23031-72362-1 located in Tulsa, OK (the "Facility")

Dear Mr.        :

I have been advised that we have not received confirmation that you have obtained, and delivered to us, proof of the minimum insurance coverage required by us. This is a material default under the Agreement.

You were advised of this default in my letter dated June 22, 2010, and unfortunately, you failed to submit proof of proper insurance coverage. As you are aware, the Facility's access to our central reservation system has been suspended for outstanding monetary and quality assurance issues. Please be advised that if we do not receive proof of proper insurance coverage by August 11, 2010, we will add Insurance to the reasons for suspension of access to our central reservation system. Please be advised that the Facility's access to our central reservation system will remain suspended until monetary, quality assurance and insurance issues have been cured to our satisfaction.

Please be advised that in the event of a termination, you will be obligated to comply with the post-termination provisions imposed by the Agreement and Franchise Operating Manual.

Enclosed, please find our current Insurance Requirements and a Sample Certificate of Liability Insurance. We urge you to remedy this default immediately. If you have any questions regarding the minimum insurance coverage, please call Suzanne Fenimore at (973) 753-7546.

Sincerely,

Carole A. Lennon
Director
Contracts Administration

Enclosure

cc:   Mark Young
      Suzanne Fenimore
      Valerie Capers Workman















**RAMADA WORLDWIDE, INC.**
22 Sylvan Way - Parsippany, NJ 07054
Phone 973-753-7356 Fax 973-753-8343
E-mail: Insurance.Administration@WyndhamWorldwide.com

### CHECKLIST

### INSURANCE REQUIREMENTS

1. Ramada requires a **Certificate of Insurance**, on proper ACORD form, providing comprehensive (Broad Form CGL) commercial general liability coverage in a minimum amount of **$1,000,000** with excess liability coverage in the amount of **$3,000,000** (per occurrence/per location)--total: **$4,000,000**. Limits must be per location, and defense costs must be supplementary payments. Endorsements limiting coverage for bodily injury are not accepted.

2. Coverage must be with licensed insurance companies rated no less than "A-" by A.M. Best. Cut through endorsements <u>are not</u> accepted. Claims made policies are not accepted.

3. All policies must contain a provision for notice of cancellation or non renewal to certificate holder of not less than **30** days.

4. **Ramada Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and all related entities,** must be named as additional insureds (an indication must be noted on the Certificate or the Additional Insured "Grantor of Franchise" endorsement form attached).

5. Comprehensive **Automobile Liability** insurance with minimum limits of $1,000,000 combined single limit per occurrence on all owned, hired and non-owned vehicles (if appropriate), and to be included in the excess liability coverage.

6. **Business Interruption** insurance with a minimum of $100,000 of coverage, actual loss, or 12 months sustained.

7. **Worker's Compensation and Employer's Liability** insurance in compliance with state laws.

8. **Liquor Liability** with minimum limits of $1,000,000 per occurrence (if the exposure exists--whether restaurant/lounge is operated by Licensee or leased to another party), and to be included in the excess liability coverage.

9. All individuals, entities, and their successors or assigns (as appropriate) which are named as Licensees in the License Agreement should be <u>named insureds</u>.

### *LOCATION OF PROPERTY MUST BE IDENTIFIED CLEARLY*
**(Street Address, City, and State)**

**Failure to demand compliance with insurance provisions is not a waiver of Licensee's obligations.**

Sample Certificate attached

Rev. 9/9/2009

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY)
«Todays_Date»

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| ABC Insurance Agency<br>Street Address<br>City, State  ZIP | |
| (Phone Number) (Fax Number)<br>(Agent E-mail) | **COMPANIES AFFORDING COVERAGE** |

| INSURED | Company<br>A | Insert Exact Carrier Name (Include A.M. Best Number) |
|---|---|---|
| (Insert Name and Address of Insured Here) | Company<br>B | |
| | Company<br>C | |
| | Company<br>D | |

**COVERAGES**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIODS INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY-LOCAL COUNTRY**<br>[X] Commercial General Liability<br>[ ] Claims Made [X] Occur<br>[ ] Owner's & Contractor's Prot<br>[X] Liquor Liability | XXXX | 8/18/09 | 8/18/10 | General Aggregate | $ 1,000,000 |
| | | | | | Products Comp/OP Agg | $ 1,000,000 |
| | | | | | Personal & Adv Injury | $ 1,000,000 |
| | | | | | Each Occurrence | $ 1,000,000 |
| | | | | | Fire Damage (Any one fire) | $   50,000 |
| | | | | | Med Exp (Any one person) | $    5,000 |
| B | **AUTOMOBILE LIABILITY**<br>[ ] Any Auto<br>[X] All Owned Autos<br>[X] Scheduled Autos<br>[X] Hired Autos<br>[X] Non-Owned Autos<br>[ ] Garage Liability | XXXX | 8/18/09 | 8/18/10 | Combined Single Limit | $ 1,000,000 |
| | | | | | Bodily Injury (per person) | |
| | | | | | Bodily Injury (per accident) | |
| | | | | | Property Damage | |
| B | **EXCESS LIABILITY**<br>[X] Umbrella Form<br>[ ] Other than Umbrella Form | | 8/18/09 | 8/18/10 | Each Occurrence | $ 3,000,000 |
| | | | | | Aggregate | $ 3,000,000 |
| A | **OTHER**<br>Property | XXXX | 8/18/09 | 8/18/10 | Building | $ 1,000,000 |
| | | | | | Contents | $  280,000 |
| | | | | | Business Interruption | $  100,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/SPECIAL ITEMS

CERTIFICATE HOLDERS ARE ADDITIONAL INSURED AS RESPECTS HOTEL/MOTEL LOCATED AT:
(INSERT ADDRESS OF INSURED PROPERTY AND SITE NUMBER IF AVAILABLE)

| CERTIFICATE HOLDER [ ] ADDITIONAL INSURED; INSURER LETTER: A | CANCELLATION |
|---|---|
| RAMADA WORLDWIDE, INC.<br>WYNDHAM WORLDWIDE CORPORATION<br>WYNDHAM HOTEL GROUP, LLC.<br>22 SYLVAN WAY<br>PARSIPPANY, NJ 07054 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT. BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS, OR REPRESENTATIVES. |
| | **AUTHORIZED REPRESENTATIVE**<br>SIGNATURE |

UPS CampusShip: Shipment Receipt                                                    Page 1 of 2

## Shipment Receipt

| | |
|---|---|
| **Transaction Date:** | 04 Aug 2010 |
| **Tracking Number:** | 1Z22445X0291955133 |

### 1 Address Information

**Ship To:**
Steve Kim & Young Kim
Min Kim
Ramada
1010 N Garnett Road
TULSA OK 741162001
Telephone:(918) 437-7660

**Ship From:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236

### 2 Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1. Letter | UPS Letter | | Reference # 1 - 006-5072 |

### 3 UPS Shipping Service and Shipping Options

**Service:**
UPS 2nd Day Air

**Guaranteed By:** [1]
End of Day Friday, 8/06/2010

| | |
|---|---|
| **Shipping Fees Subtotal:** | **15.59 USD** |
| Transportation | 14.50 USD |
| Fuel Surcharge | 1.09 USD |

### 4 Payment Information

**Bill Shipping Charges to:**          Shipper's Account 22445X

| Negotiated rates were applied to this shipment. | |
|---|---|
| **Total Charged:** | **15.59 USD** |
| **Negotiated Total:** | **4.86 USD** |

# EXHIBIT D



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ  07054
973.753.6000  Phone
800.880.9445  Fax

September 21, 2010

**VIA 2 DAY DELIVERY METHOD**

Mr. Min Kim
1010 N. Garnett Road
Tulsa, OK  74116

**RE:     License Agreement, dated September 25, 2007, (the "Agreement") between Steve Young Kim and Young Soon Kim ("you" or "your") and Ramada Worldwide Inc. ("we", "our" or "us") for the Ramada® lodging facility located at Tulsa, OK / #23031-72362-01 (the "Facility")**

Dear Mr. Kim:

We write to give you formal notice of the termination of the License granted under the Agreement to operate the Facility as part of the Ramada System (the "Notice").  This termination is a result of your failure to cure your default under the Agreement, due to your failure to meet your insurance obligations.  The termination of your Agreement is effective as of September 21, 2010 (the "Termination Date").

Because your License is terminated, you must now perform your post-termination obligations such as removal of all items that display or refer to the Ramada brand at the Facility.  The de-identification procedures are specified in the attachment to this letter.  These de-identification procedures must be completed within 10 days after the date of this Notice.

You must also immediately pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process.  We estimate that, as of September 21, 2010, you owe us $162,620.28 in Recurring Fees.  This amount is described in more detail in the attached itemized statement.  Additionally, you must pay us Liquidated Damages of $158,000.00 as specified in section 18.1 of the Agreement.

If within the 10 day period described above, you do not timely remove the exterior signage which bears the Ramada name and marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us.  If you object to the removal of the signage by our independent contractor, you must notify us within 14 days of the date of this letter.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

     

    

Mr. Min Kim
September 21, 2010
Page Two

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions regarding your obligations under this letter, please contact Larry Geer, Sr. Director of Settlements, at (973) 753-7131.

Sincerely,

Carole A. Lennon
Director
Contracts Administration

Enclosures

cc:     Steve Young Kim
        Young Soon Kim
        Mark Young
        Larry Geer

## DE-IDENTIFICATION PROCEDURES

You must complete each of the following within 10 days after the Termination Date:

1.  Remove, replace or cover with an opaque cover the primary Facility signage.

2.  Remove all interior signage that contains Ramada Marks.

3.  Change advertising billboards to remove Ramada Marks.

4.  Stop answering Facility telephone as Ramada guest lodging facility.

5.  Remove Ramada name and Marks from any domain name, advertising and brochures.

6.  Return to us all confidential operations and training manuals.

7.  Remove the Ramada name and Marks from the following items:

| | |
|---|---|
| Stationery, pads and pens | Soap/shampoo |
| Directories and brochures | Key tags |
| Business cards | Credit card imprinter |
| Folios and registration cards | Laundry bags |
| Do-not-disturb cards | Name tags/uniforms |
| Comment cards | Ice buckets/trays |
| Telephone plates | Ashtrays/matches |
| Telephone dialing instructions | Plaques |
| TV channel ID plates | Guest checks/receipts |
| Rate/law cards | Menus |
| Door signage | |

8.  Paint over or remove any distinctive Ramada trade dress, paint schemes or architectural features.

9.  It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Ramada facility.

10. Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

Report Date : 21-SEP-10

ITEMIZED STATEMENT
-----------------

As of Date (DD-MMM-YYYY) :  21-SEP-2010
Customer No              :  23031-72362-01-RAM
Category Set             :
Category Group           :
Group No                 :
Bankruptcy               :  No Bankruptcy Sites
Disputed                 :  No
Finance Charges Included:  Yes

Page 1 of 10

Report Date : 21-SEP-10

ITEMIZED STATEMENT
------------------

Customer No : 23031-72362-01-RAM
Address :    1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:  21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| APR-2008 | 40587205 | 30-APR-08 | Actual-1000A-RO | | 0.00 | 0.00 | 96.46 | 96.46 |
| | | | | Sub Total | 0.00 | 0.00 | 96.46 | 96.46 |
| MAY-2008 | 30191079 | 20-MAY-08 | CRS REACTIVATIO | | 200.00 | 0.00 | 39.18 | 239.18 |
| | 25021578 | 22-MAY-08 | WYNREWARDS 5% | | 782.73 | 0.00 | 309.53 | 1092.26 |
| | 4269175 | 29-MAY-08 | GDS & INTERNET | | 243.00 | 0.00 | 96.20 | 339.20 |
| | TM3269175 | 29-MAY-08 | MEMBER BENEFIT | | 69.84 | 0.00 | 27.61 | 97.45 |
| | TA3269175 | 29-MAY-08 | T/A COMMISSIONS | | 270.15 | 0.00 | 106.86 | 377.01 |
| | TG3269175 | 29-MAY-08 | GSA FEES | | 9.36 | 0.00 | 3.77 | 13.13 |
| | TR3269175 | 29-MAY-08 | TMC / CONSORTIA | | 26.67 | 0.00 | 10.49 | 37.16 |
| | TC3269175 | 29-MAY-08 | T/A COMM SERVIC | | 17.02 | 0.00 | 6.72 | 23.74 |
| | | | | Sub Total | 1618.77 | 0.00 | 600.36 | 2219.13 |
| JUN-2008 | 25022629 | 22-JUN-08 | WYNREWARDS 5% | | 599.26 | 0.00 | 227.75 | 827.01 |
| | TR3275523 | 27-JUN-08 | TMC / CONSORTIA | | 17.56 | 0.00 | 6.62 | 24.18 |
| | 4275523 | 27-JUN-08 | GDS & INTERNET | | 119.75 | 0.00 | 45.60 | 165.35 |
| | TC3275523 | 27-JUN-08 | T/A COMM SERVIC | | 24.62 | 0.00 | 9.33 | 33.95 |
| | TA3275523 | 27-JUN-08 | T/A COMMISSIONS | | 489.52 | 0.00 | 186.02 | 675.54 |
| | 40651556 | 30-JUN-08 | Actual-1230A-RI | | 2663.05 | 0.00 | 1012.03 | 3675.08 |
| | 40650400 | 30-JUN-08 | Actual-1000A-RO | | 2282.61 | 0.00 | 867.40 | 3150.01 |
| | | | | Sub Total | 6196.37 | 0.00 | 2354.75 | 8551.12 |
| JUL-2008 | 25023572 | 22-JUL-08 | WYNREWARDS 5% | | 269.59 | 0.00 | 98.25 | 367.84 |
| | TC3281902 | 25-JUL-08 | T/A COMM SERVIC | | 6.55 | 0.00 | 2.37 | 8.92 |
| | 4281902 | 25-JUL-08 | GDS & INTERNET | | 71.50 | 0.00 | 26.07 | 97.57 |
| | TR3281902 | 25-JUL-08 | TMC / CONSORTIA | | 11.92 | 0.00 | 4.29 | 16.21 |
| | TA3281902 | 25-JUL-08 | T/A COMMISSIONS | | 125.84 | 0.00 | 45.87 | 171.71 |
| | 40684084 | 31-JUL-08 | Actual-1230A-RI | | 3428.19 | 0.00 | 1289.52 | 4717.71 |
| | 40682928 | 31-JUL-08 | Actual-1000A-RO | | 2938.45 | 0.00 | 1105.37 | 4043.82 |

Case 2:13-cv-04472-DMC-JAD   Document 1   Filed 07/24/13   Page 74 of 82 PageID: 74

Report Date : 21-SEP-10

ITEMIZED STATEMENT
------------------

Customer No :   23031-72362-01-RAM
Address :       1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:     21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
|          |           |              |             | Sub Total | 6852.04 | 0.00 | 2571.74 | 9423.78 |
| AUG-2008 | 25024742 | 22-AUG-08 | WYNREWARDS 5% | | 638.54 | 0.00 | 223.22 | 861.76 |
|          | TC3288325 | 30-AUG-08 | T/A COMM SERVIC | | 264.15 | 0.00 | 92.25 | 356.40 |
|          | TA3288325 | 30-AUG-08 | T/A COMMISSIONS | | 5238.30 | 0.00 | 1830.71 | 7069.01 |
|          | TR3288325 | 30-AUG-08 | TMC / CONSORTIA | | 18.02 | 0.00 | 6.30 | 24.32 |
|          | TN3288325 | 30-AUG-08 | MEMBER BENEFIT | | 28.89 | 0.00 | 10.09 | 38.98 |
|          | 4288325 | 30-AUG-08 | GDS & INTERNET | | 191.50 | 0.00 | 66.93 | 258.43 |
|          | TG3288325 | 30-AUG-08 | GSA FEES | | 7.55 | 0.00 | 2.66 | 10.21 |
|          | 40707746 | 31-AUG-08 | Actual-1G00A-RO | | 2652.79 | 0.00 | 927.16 | 3579.95 |
|          | 40708538 | 31-AUG-08 | Actual-1230A-RI | | 3094.93 | 0.00 | 1081.63 | 4176.56 |
|          |           |              |             | Sub Total | 12134.67 | 0.00 | 4240.95 | 16375.62 |
| SEP-2008 | 10268763 | 04-SEP-08 | GUEST SRVCS PRO | | 60.00 | 0.00 | 20.97 | 80.97 |
|          | 30232118 | 12-SEP-08 | 2009 RMA DUES | | 2370.00 | 0.00 | 828.38 | 3198.38 |
|          | 25025102 | 22-SEP-08 | WYNREWARDS 5% | | 289.76 | 0.00 | 96.79 | 386.55 |
|          |           |              |             | Sub Total | 2719.76 | 0.00 | 946.14 | 3665.90 |
| OCT-2008 | TC3301046 | 24-OCT-08 | T/A COMM SERVIC | | 13.26 | 0.00 | 4.30 | 17.56 |
|          | 40770194 | 31-OCT-08 | Actual-1000A-RO | | 3465.01 | 0.00 | 1105.40 | 4570.41 |
|          | 40769078 | 31-OCT-08 | Actual-1230A-RI | | 4042.52 | 0.00 | 1289.60 | 5332.12 |
|          |           |              |             | Sub Total | 7520.79 | 0.00 | 2399.30 | 9920.09 |
| NOV-2008 | 10305684 | 05-NOV-08 | GUEST SRVCS PRO | | 60.00 | 0.00 | 19.14 | 79.14 |
|          | 10305680 | 05-NOV-08 | GUEST SRVCS PRO | | 60.00 | 0.00 | 19.14 | 79.14 |
|          | 10310067 | 20-NOV-08 | GUEST SRVCS PRO | | 60.00 | 0.00 | 18.21 | 78.21 |
|          | 25027130 | 22-NOV-08 | WYNREWARDS 5% | | 536.61 | 0.00 | 162.89 | 699.50 |

Report Date : 21-SEP-10

ITEMIZED STATEMENT
------------------

Customer No : 23031-72362-01-RAM
Address   :  1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date :  21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 4307424 | 28-NOV-08 | GDS & INTERNET | | 493.50 | 0.00 | 149.77 | 643.27 |
| | TM3307424 | 28-NOV-08 | MEMBER BENEFIT | | 135.40 | 0.00 | 41.11 | 176.51 |
| | TC3307424 | 28-NOV-08 | T/A COMM SERVIC | | 77.67 | 0.00 | 23.57 | 101.24 |
| | TA3307424 | 28-NOV-08 | T/A COMMISSIONS | | 1404.94 | 0.00 | 426.41 | 1831.35 |
| | TR3307424 | 28-NOV-08 | TMC / CONSORTIA | | 161.94 | 0.00 | 49.16 | 211.10 |
| | 40806753 | 30-NOV-08 | Actual-1000A-RO | | 1145.25 | 0.00 | 364.84 | 1510.09 |
| | 40805967 | 30-NOV-08 | Actual-1230A-RI | | 1336.12 | 0.00 | 425.66 | 1761.78 |
| | | | | Sub Total | 5471.43 | 0.00 | 1699.90 | 7171.33 |
| DEC-2008 | 25028657 | 22-DEC-08 | WYNREWARDS 5% | | 3.06 | 0.00 | 0.93 | 3.99 |
| | TG3313750 | 26-DEC-08 | GSA FEES | | 7.90 | 0.00 | 2.26 | 10.16 |
| | TM3313750 | 26-DEC-08 | MEMBER BENEFIT | | 30.24 | 0.00 | 8.70 | 38.94 |
| | TC3313750 | 26-DEC-08 | T/A COMM SERVIC | | 71.14 | 0.00 | 20.48 | 91.62 |
| | TR3313750 | 26-DEC-08 | TMC / CONSORTIA | | 79.76 | 0.00 | 23.04 | 102.80 |
| | TA3313750 | 26-DEC-08 | T/A COMMISSIONS | | 1625.13 | 0.00 | 468.06 | 2093.19 |
| | 4313750 | 26-DEC-08 | GDS & INTERNET | | 152.25 | 0.00 | 43.83 | 196.08 |
| | 40836679 | 31-DEC-08 | Actual-1230A-RI | | 1418.16 | 0.00 | 408.40 | 1826.56 |
| | 40836218 | 31-DEC-08 | Actual-1000A-RO | | 1215.57 | 0.00 | 350.05 | 1565.62 |
| | | | | Sub Total | 4603.21 | 0.00 | 1325.75 | 5928.96 |
| JAN-2009 | 25029783 | 22-JAN-09 | WYNREWARDS 5% | | 10.71 | 0.00 | 2.97 | 13.68 |
| | TR3320464 | 29-JAN-09 | TMC / CONSORTIA | | 60.38 | 0.00 | 16.62 | 77.00 |
| | 4320464 | 29-JAN-09 | GDS & INTERNET | | 125.30 | 0.00 | 34.31 | 159.61 |
| | TM3320464 | 29-JAN-09 | MEMBER BENEFIT | | 18.63 | 0.00 | 5.12 | 23.75 |
| | TC3320464 | 29-JAN-09 | T/A COMM SERVIC | | 21.15 | 0.00 | 5.84 | 26.99 |
| | TA3320464 | 29-JAN-09 | T/A COMMISSIONS | | 398.53 | 0.00 | 109.24 | 507.77 |
| | 40865603 | 31-JAN-09 | Actual-1000A-RO | | 1773.63 | 0.00 | 485.93 | 2259.56 |
| | 40865677 | 31-JAN-09 | Actual-1230A-RI | | 2069.23 | 0.00 | 566.95 | 2636.18 |
| | | | | Sub Total | 4477.56 | 0.00 | 1226.98 | 5704.54 |

Report Date : 21-SEP-10

ITEMIZED STATEMENT
------------------

Customer No : 23031-72362-01-RAM
Address :        1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:      21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| FEB-2009 | 25029986 | 22-FEB-09 | WYNREWARDS CROT | | (153.96) | 0.00 | 0.00 | (153.96) |
| | 25030574 | 22-FEB-09 | WYNREWARDS 5% | | 146.62 | 0.00 | 37.88 | 184.50 |
| | 30290848 | 25-FEB-09 | CRS REACTIVATIO | | 200.00 | 0.00 | 51.70 | 251.70 |
| | TC3327124 | 26-FEB-09 | T/A COMM SERVIC | | 8.34 | 0.00 | 2.19 | 10.53 |
| | 4327124 | 26-FEB-09 | GDS & INTERNET | | 151.10 | 0.00 | 39.06 | 190.16 |
| | TA3327124 | 26-FEB-09 | T/A COMMISSIONS | | 165.94 | 0.00 | 42.88 | 208.82 |
| | TR3327124 | 26-FEB-09 | TMC / CONSORTIA | | 9.46 | 0.00 | 2.47 | 11.93 |
| | 40896913 | 28-FEB-09 | Actual-1230A-RI | | 1754.87 | 0.00 | 453.62 | 2208.49 |
| | 40897550 | 28-FEB-09 | Actual-1000A-RO | | 1504.17 | 0.00 | 388.77 | 1892.94 |
| | | | | Sub Total | 3786.54 | 0.00 | 1018.57 | 4805.11 |
| MAR-2009 | 30299861 | 27-MAR-09 | Q/A REINSPECTIO | | 1000.00 | 0.00 | 243.50 | 1243.50 |
| | 4333433 | 27-MAR-09 | GDS & INTERNET | | 112.70 | 0.00 | 27.47 | 140.17 |
| | TA3333433 | 27-MAR-09 | T/A COMMISSIONS | | 191.36 | 0.00 | 46.63 | 237.99 |
| | TC3333433 | 27-MAR-09 | T/A COMM SERVIC | | 9.61 | 0.00 | 2.32 | 11.93 |
| | TR3333433 | 27-MAR-09 | TMC / CONSORTIA | | 25.04 | 0.00 | 6.14 | 31.18 |
| | 40930680 | 31-MAR-09 | Actual-1230A-RI | | 1531.28 | 0.00 | 399.81 | 1931.09 |
| | 40929534 | 31-MAR-09 | Actual-1000A-RO | | 1312.53 | 0.00 | 342.70 | 1655.23 |
| | | | | Sub Total | 4182.52 | 0.00 | 1068.57 | 5251.09 |
| APR-2009 | 25032137 | 22-APR-09 | WYNREWARDS 5% | | 19.25 | 0.00 | 4.41 | 23.66 |
| | 2315025 | 24-APR-09 | GDS & IKTERNET | | 24.75 | 0.00 | 5.61 | 30.36 |
| | 40962087 | 30-APR-09 | Actual-1230A-RI | | 2203.67 | 0.00 | 537.38 | 2741.05 |
| | 40962053 | 30-APR-09 | Actual-1000A-RO | | 1888.86 | 0.00 | 460.58 | 2349.44 |
| | | | | Sub Total | 4136.53 | 0.00 | 1007.98 | 5144.51 |
| MAY-2009 | 25032837 | 22-MAY-09 | WYNREWARDS 5% | | 37.64 | 0.00 | 7.97 | 45.61 |
| | 1006943 | 22-MAY-09 | GDS & INTERNET | | 26.75 | 0.00 | 5.65 | 32.40 |
| | 40993881 | 31-MAY-09 | Actual-1230A-RI | | 1303.12 | 0.00 | 312.27 | 1615.39 |
| | 40993418 | 31-MAY-09 | Actual-1000A-RO | | 1116.96 | 0.00 | 267.62 | 1384.58 |

Report Date : 21-SEP-10

## ITEMIZED STATEMENT

Customer No : 23031-72362-01-RAM
Address :    1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:    21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|-----------|----------------|-------|
| | | | | Sub Total | 2484.47 | 0.00 | 593.51 | 3077.98 |
| JUN-2009 | 30317967 | 05-JUN-09 | Q/A REINSPECTIO | | 1500.00 | 0.00 | 319.50 | 1819.50 |
| | 10361091 | 18-JUN-09 | GUEST SATISFACT | | 45.00 | 0.00 | 8.93 | 53.93 |
| | 10361090 | 18-JUN-09 | GUEST SRVCS TRA | | 100.00 | 0.00 | 19.75 | 119.75 |
| | 1013532 | 25-JUN-09 | GOS & INTERNET | | 14.05 | 0.00 | 2.79 | 16.84 |
| | 41025367 | 30-JUN-09 | Actual-1000A-RO | | 1504.02 | 0.00 | 314.55 | 1818.57 |
| | 41027138 | 30-JUN-09 | Actual-1230A-RI | | 1754.69 | 0.00 | 366.99 | 2121.68 |
| | | | | Sub Total | 4917.76 | 0.00 | 1032.51 | 5950.27 |
| JUL-2009 | 25035509 | 22-JUL-09 | WYNREWARDS 5% | | 40.30 | 0.00 | 7.28 | 47.58 |
| | 10372812 | 23-JUL-09 | GUEST SATISFACT | | 25.00 | 0.00 | 4.58 | 29.58 |
| | 10372811 | 23-JUL-09 | GUEST SRVCS TRA | | 100.00 | 0.00 | 18.20 | 118.20 |
| | 41059050 | 31-JUL-09 | Actual-1230A-RI | | 1996.82 | 0.00 | 379.32 | 2376.14 |
| | 41060539 | 31-JUL-09 | Actual-1000A-RO | | 1711.56 | 0.00 | 325.13 | 2036.69 |
| | | | | Sub Total | 3873.68 | 0.00 | 734.51 | 4608.19 |
| AUG-2009 | 25036156 | 22-AUG-09 | WYNREWARDS 5% | | 15.45 | 0.00 | 2.58 | 18.03 |
| | 41094560 | 31-AUG-09 | Actual-1230A-RI | | 1883.94 | 0.00 | 314.62 | 2198.56 |
| | 41092545 | 31-AUG-09 | Actual-1000A-RO | | 1614.81 | 0.00 | 269.67 | 1884.48 |
| | | | | Sub Total | 3514.20 | 0.00 | 586.87 | 4101.07 |
| SEP-2009 | 30341105 | 10-SEP-09 | 2010 RMA DUES | | 2370.00 | 0.00 | 251.24 | 2621.24 |
| | 30342050 | 11-SEP-09 | Q/A REINSPECTIO | | 1500.00 | 0.00 | 250.50 | 1750.50 |
| | 41128538 | 30-SEP-09 | Actual-1230A-RI | | 1410.95 | 0.00 | 213.75 | 1624.70 |
| | 41127575 | 30-SEP-09 | Actual-1000A-RO | | 1209.39 | 0.00 | 183.25 | 1392.64 |

Page 6 of 10

Report Date : 21-SEP-10

ITEMIZED STATEMENT
------------------

```
Customer No :  23031-72362-01-RAM
Address :      1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:    21-SEP-2010
```

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|-----------|----------------|-------|
| | | | | **Sub Total** | 6490.34 | 0.00 | 898.74 | 7389.08 |
| OCT-2009 | 25038478 | 22-OCT-09 | WYNREWAROS 5% | | 93.16 | 0.00 | 12.70 | 105.86 |
| | 30351262 | 30-OCT-09 | AUDIT INTEREST | | 330.00 | 0.00 | 45.07 | 375.07 |
| | 30351255 | 3C-OCT-09 | AUDIT ROYALTY | | 1091.61 | 0.00 | 148.99 | 1240.60 |
| | 30351260 | 30-OCT-09 | AUDIT RINA FEE | | 1273.54 | 0.00 | 173.83 | 1447.37 |
| | 30351261 | 30-OCT-09 | AUDIT COST | | 1000.00 | 0.00 | 136.50 | 1136.50 |
| | 41162257 | 31-OCT-09 | Accrual-1230A-R | * | 3396.86 | 0.00 | 463.66 | 3860.52 |
| | 41164160 | 31-OCT-09 | Accrual-1000A-R | * | 2911.59 | 0.00 | 397.42 | 3309.01 |
| | | | | **Sub Total** | 10096.76 | 0.00 | 1378.17 | 11474.93 |
| NOV-2009 | 30354031 | 12-NOV-09 | Q/A REINSPECTIO | | 1500.00 | 0.00 | 204.75 | 1704.75 |
| | 25040026 | 22-NOV-09 | WYNREWARDS 5% | | 318.17 | 0.00 | 38.48 | 356.65 |
| | 41199077 | 30-NOV-09 | Accrual-1230A-R | * | 1190.41 | 0.00 | 142.86 | 1323.27 |
| | 41198509 | 30-NOV-09 | Accrual-1000A-R | * | 1011.78 | 0.00 | 122.42 | 1134.20 |
| | | | | **Sub Total** | 4010.36 | 0.00 | 508.51 | 4518.87 |
| DEC-2009 | 41230459 | 31-DEC-09 | Accrual-1230A-R | * | 1213.07 | 0.00 | 127.98 | 1341.05 |
| | 41230254 | 31-DEC-09 | Accrual-1000A-R | * | 1039.77 | 0.00 | 109.72 | 1149.49 |
| | | | | **Sub Total** | 2252.84 | 0.00 | 237.70 | 2490.54 |
| JAN-2010 | 30389557 | 14-JAN-10 | Q/A REINSPECTIO | | 1500.00 | 0.00 | 158.25 | 1658.25 |
| | 25041849 | 22-JAN-10 | WYNREWARDS 5% | | 69.45 | 0.00 | 6.36 | 75.81 |
| | 41262732 | 31-JAN-10 | Accrual-1000A-R | * | 1520.91 | 0.00 | 139.14 | 1660.05 |
| | 41263210 | 31-JAN-10 | Accrual-1230A-R | * | 1774.40 | 0.00 | 162.36 | 1936.76 |

Report Date : 21-SEP-10

ITEMIZED STATEMENT
------------------

Customer No : 23031-72362-01-RAM
Address :    1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:  21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| | | | | Sub Total | 4864.76 | 0.00 | 466.11 | 5330.87 |
| FEB-2010 | 41296769 | 28-FEB-10 | Accrual-1000A-R | * | 1413.27 | 0.00 | 107.42 | 1520.69 |
| | 41297365 | 28-FEB-10 | Accrual-1230A-R | * | 1648.82 | 0.00 | 125.32 | 1774.14 |
| | | | | Sub Total | 3062.09 | 0.00 | 232.74 | 3294.83 |
| MAR-2010 | 30413180 | 12-MAR-10 | '10 GLOBAL CONF | | 999.00 | 0.00 | 61.43 | 1060.43 |
| | 30415101 | 12-MAR-10 | O/A REINSPECTIO | | 1700.00 | 0.00 | 129.20 | 1829.20 |
| | 25043903 | 22-MAR-10 | WYNREWARDS 5% | | 82.15 | 0.00 | 5.00 | 87.15 |
| | 41331857 | 31-MAR-10 | Accrual-1000A-R | * | 1154.34 | 0.00 | 70.42 | 1224.76 |
| | 41332607 | 31-MAR-10 | Accrual-1230A-R | * | 1346.73 | 0.00 | 82.14 | 1428.87 |
| | | | | Sub Total | 5282.22 | 0.00 | 348.19 | 5630.41 |
| APR-2010 | 30428482 | 14-APR-10 | ONLINE LRNG LIB | | 50.00 | 0.00 | 3.06 | 53.06 |
| | 25044883 | 22-APR-10 | WYNREWARDS 5% | | 39.93 | 0.00 | 1.82 | 41.75 |
| | 41367448 | 30-APR-10 | Accrual-1230A-R | * | 2169.34 | 0.00 | 98.70 | 2268.04 |
| | 41367175 | 30-APR-10 | Accrual-1000A-R | * | 1859.43 | 0.00 | 84.60 | 1944.03 |
| | | | | Sub Total | 4118.70 | 0.00 | 188.18 | 4306.88 |
| MAY-2010 | 25045272 | 22-MAY-10 | WYNREWARDS 5% | | 16.70 | 0.00 | 0.51 | 17.21 |
| | 41400835 | 31-MAY-10 | Accrual-1000A-R | * | 1192.62 | 0.00 | 36.38 | 1229.00 |
| | 41401431 | 31-MAY-10 | Accrual-1230A-R | * | 1391.39 | 0.00 | 42.44 | 1433.83 |
| | | | | Sub Total | 2600.71 | 0.00 | 79.33 | 2680.04 |

Report Date : 21-SEP-10

ITEMIZED STATEMENT
-----------------

Customer No :  23031-72362-01-RAM
Address :      1010 N. Garnett Rd.,Tulsa,OK,74116,US
As of Date:    21-SEP-2010

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| JUN-2010 | 25046499 | 22-JUN-10 | WYNREWARDS 5% | | 2.75 | 0.00 | 0.04 | 2.79 |
| | 41435939 | 30-JUN-10 | Accrual-1230A-R | * | 1881.01 | 0.00 | 28.22 | 1909.23 |
| | 41434332 | 30-JUN-10 | Accrual-1000A-R | * | 1612.29 | 0.00 | 24.18 | 1636.47 |
| | | | | Sub Total | 3496.05 | 0.00 | 52.44 | 3548.49 |
| JUL-2010 | 25047302 | 22-JUL-10 | WYNREWARDS 5% | | 33.75 | 0.00 | 0.00 | 33.75 |
| | 41467886 | 31-JUL-10 | Accrual-1000A-R | * | 1932.42 | 0.00 | 0.00 | 1932.42 |
| | 41468707 | 31-JUL-10 | Accrual-1230A-R | * | 2254.49 | 0.00 | 0.00 | 2254.49 |
| | | | | Sub Total | 4220.66 | 0.00 | 0.00 | 4220.66 |
| AUG-2010 | 25047711 | 22-AUG-10 | WYNREWARDS 5% | | 5.50 | 0.00 | 0.00 | 5.50 |
| | 41500025 | 31-AUG-10 | Accrual-1230A-R | * | 2172.17 | 0.00 | 0.00 | 2172.17 |
| | 41500608 | 31-AUG-10 | Accrual-1000A-R | * | 1861.86 | 0.00 | 0.00 | 1861.86 |
| | | | | Sub Total | 4039.53 | 0.00 | 0.00 | 4039.53 |
| SEP-2010 | 30485413 | 10-SEP-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 0.00 | 1700.00 |
| | | | | Sub Total | 1700.00 | 0.00 | 0.00 | 1700.00 |
| | | | | Grand Total | 134725.32 | 0.00 | 27894.96 | 162620.28 |

Requested By: Patrick Yeu

Page 9 of 10

Case 2:13-cv-04472-DMC-JAD   Document 1   Filed 07/24/13   Page 81 of 82 PageID: 81

Report Date : 21-SEP-10

ITEMIZED STATEMENT
--------------------

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.


****** END OF REPORT ******


Page 10 of 10

UPS CampusShip: Shipment Receipt                                                    Page 1 of 2

## Shipment Receipt

**Transaction Date:**                          23 Sep 2010
**Tracking Number:**                           1Z22445X0295033596

### 1 Address Information

**Ship To:**                    **Ship From:**
Mr. Min Kim                     Wyndham Hotel Group - 22 Sylvan
                                Patrick Yeu
1010 N. Garnett Road            22 Sylvan Way
TULSA OK 741162001              Parsippany NJ 07054
Telephone:951-836-2002          Telephone:973-753-7831

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Patrick Yeu
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7831

### 2 Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|--------|------------------------|----------------|-------------------|
| 1.  Letter | UPS Letter | | Reference # 1 - 006-5072 |

### 3 UPS Shipping Service and Shipping Options

**Service:**
UPS 2nd Day Air

**Guaranteed By:** [1]
End of Day Monday, 9/27/2010

| **Shipping Fees Subtotal:** | **15.52 USD** |
|---|---|
| Transportation | 14.50 USD |
| Fuel Surcharge | 1.02 USD |

### 4 Payment Information

**Bill Shipping Charges to:**            Shipper's Account 22445X

| Negotiated rates were applied to this shipment. | |
|---|---|
| **Total Charged:** | **15.52 USD** |
| **Negotiated Total:** | **4.84 USD** |